**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

THE ESTATE OF THOMAS KIRBY and
BRENDA KIRBY,

       Plaintiffs,

v.                               Case No. 05-CV-71884-DT

DEPUTY DUVA, DEPUTY CARRIER,
SERGEANT BUCKLEY, LIEUTENANT
MUXLOW, and COUNTY OF ST. CLAIR,

       Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' "MOTION FOR SUMMARY JUDGMENT"**

Pending before the court in this excessive force case is Defendants' April 17, 2006 "Motion for Summary Judgment." This motion has been fully briefed and the court conducted a hearing on June 14, 2006.

Plaintiff's decedent was shot and killed by Sheriff's deputies as he sat in his vehicle which had been signaled to stop and was boxed in by police vehicles on the shoulder of a state highway. Deputies allege that the decedent, unarmed at the time but thought to be generally dangerous, was trying to run one or more of them down in an effort to flee. An independent witness to the shooting, however, testified that if the deputies "were worried about him getting away, he couldn't. He wasn't going anywhere." The witness said that after trying unsuccessfully to maneuver between the other vehicles, the decedent's vehicle had its brake lights on "and he was at a full stop when Officer Buckley started shooting." The court will grant in part and deny in part Defendants' motion.

## I.  BACKGROUND

Plaintiffs'[1] "First Amended Complaint" comprises seven counts: (1) Count 1: Constitutional Deprivation under 42 U.S.C. § 1983, asserting that the Defendant deputies (Deputy Damon Duva, Deputy Jason Carrier, Sergeant Thomas Buckley and Lieutenant Muxlow) violated Mr. Kirby's constitutional rights by using excessive force in violation of the Fourth Amendment during the course of Mr. Kirby's arrest, resulting in his death; (2) Count II: "Violation of Ministerial Duties," asserting that the Defendant deputies breached their alleged duties of care in their actions against Mr. Kirby; (3) Count III: "Intentional Infliction of Emotional Distress," asserted against the Defendant deputies; (4) Count IV: "Constitutional Deprivation" under 42 U.S.C. § 1983, alleging that Defendant County of St. Clair is municipally liable for the Defendant deputies' alleged constitutional violations; (5) Count V: "Negligent Infliction of Emotional Distress," brought by Plaintiff Brenda Kirby for her husband's death; (6) Count VI: "Gross Negligence," asserted against the Defendant officers; and (7) Count VII: "Civil Conspiracy to Violate Plaintiff's Civil Rights," asserted against the Defendant officers.

### A.  General Facts[2]

On November 4, 2003, the St. Clair County Drug Task Force ("DTF") procured a search warrant to search both Thomas Kirby and his residence at 3702 Kilgore in Kenockee Township.  (Defs.' Mot. Br. at v, Pls.' Resp. Br. at iv.)  Defendants contend that the warrant was procured based on information received from a reliable confidential

---

[1]The original complaint listed five Plaintiffs, but the amended complaint lists only two: the Estate of Thomas Kirby and Brenda Kirby.

[2]Except where otherwise indicated, the general facts are undisputed.

informant that Mr. Kirby was distributing narcotics from his home.  (Defs.' Mot. Br. at v.)
Plaintiffs dispute that the informant was reliable, and also argue that any information
offered by the informant is "double hearsay."  (Pls.' Resp. Br. at iv.)

On the same day that the warrant was issued, DTF deputies, Defendants Carrier,
Duva and Buckley effectuated a traffic stop of Mr. Kirby on the shoulder of westbound
Lapeer Road in St. Clair County.  Defendant Duva pulled his unmarked vehicle in front
of Mr. Kirby's Ford Ranger pickup, while Defendants Buckley and Carrier pulled the
marked cruiser behind the Ranger.  (Defs.' Mot. Br. at v, Pls.' Resp. Br. at iv.)

A ditch lay adjacent to the area at which the three vehicles stopped. (Defs.' Mot.
Br. at v, Pls.' Resp. Br. at iv.)  After stopping, Mr. Kirby reversed his Ranger towards the
cruiser as Defendant Buckley was approaching from behind.  (Defs.' Mot. Br. at v, Pls.'
Resp. Br. at iv.)  The parties dispute how the situation escalated from here, but both
parties agree that all three Defendants eventually fired at Mr. Kirby's vehicle, resulting in
his death.  (Defs.' Mot. Br. at v-vi, Pls.' Resp. Br. at vi.)  Two laypersons were present in
the general vicinity of the incident, Paul Moore and Rose Kornieck.  (Defs.' Mot. Br. at v,
Pls.' Resp. Br. at vi.)  Mr. Moore was directly behind the cruiser in a full-sized van and
Ms. Kornieck was behind Mr. Moore's van in a mini-van.   (Defs.' Mot. Br. at v, Pls.'
Resp. Br. at iv.)

After the incident, DTF executed the search warrant on Mr. Kirby's house and
arrested his wife, Plaintiff Brenda Kirby, for narcotic possession.  Mrs. Kirby confirmed
the presence of weapons and surveillance cameras in the home.  (Defs.' Mot. Br. at vi,
Pls.' Resp. Br. at vii.)

**B.  The Deputies' Version of the Traffic Stop**

3

Although the parties to some extent dispute the events leading up to the traffic stop of Mr. Kirby, these disputes are largely irrelevant to the inquiry before the court. To the extent any of these disputes are relevant, the court will address them in the Discussion section of this order. Instead, the heart of the parties' arguments focus on the seemingly different versions of how the traffic stop, which culminated in Mr. Kirby's death, occurred.

Defendants contend that, after receiving information that Mr. Kirby was selling methamphetamines and/or crack cocaine out of his home, the DTF obtained a search warrant for Mr. Kirby's home and person. (Defs.' Br. at 1.) Defendants further contend that they possessed information that Mr. Kirby had installed a security surveillance system in his home, possessed many weapons, and was generally "paranoid." (*Id.*; *see also* Buckley Dep. I, Defs.' Ex. 6 at 24-25.)[3] In light of this information, as well as their general impression of the unpredictable nature of alleged methamphetamine addicts, the deputies decided to detain Mr. Kirby away from his home. (Defs.' Br. at 2-3.) After setting up a surveillance point, Defendants located Mr. Kirby. (*Id.* at 4.)

Defendants Buckley and Carrier made visual contact with Mr. Kirby's Ford Ranger truck as it was traveling westbound on Lapeer Road. They activated the cruiser's overhead lights, and after approximately a half mile to one mile, or "maybe even a little bit less than that," Mr. Kirby pulled over onto the shoulder of Lapeer Road. (Defs.' Br. at 4; Carrier's Dep. I at 78, Defs.' Ex. 8.) Defendant Carrier, who was driving

---

[3]Although Plaintiffs contend such information is hearsay and thus inadmissible, this evidence could be admitted if it were offered not to prove the truth of the matter asserted, (i.e., that such items were indeed present at the Kirby home and that Kirby was indeed paranoid), but instead were offered in support of Defendants' mental impression of Mr. Kirby. *See generally* Fed. R. Evid. 801.

4

the patrol car, positioned his car behind Mr. Kirby's truck, but not as far into the shoulder

as Mr. Kirby's truck due to safety concerns.  (Defs.' Br. at 5.)  Defendant Duva, who was

following in an unmarked vehicle, passed both vehicles and positioned his car in front of

Mr. Kirby's Ford Ranger, at an angle.  (*Id.*)  Defendants contend that approximately 10

feet separated Mr. Kirby's Ranger from both the patrol car behind him and the

unmarked vehicle in front of him.  (*Id.*)[4]

      According to Defendants, the following events then transpired, leading to the

shooting and death of Mr. Kirby:

> Sgt. Buckley and Deputy Carrier exited the cruiser with their weapons
> drawn.  Deputy Carrier intended to approach Mr. Kirby via the driver side
> portion of the Ranger, while Sgt. Buckley sought to approach the Ranger
> via its passenger side door.  Deputy Carrier identified himself as a law
> enforcement officer upon arrival at the Ranger's driver side door.  He
> further yelled at Mr. Kirby to turn off his vehicle and show his hands.  Mr.
> Kirby defiantly ignored the deputy's commands.
>
> Meanwhile, Sgt. Buckley exited from the cruiser's passenger side.  He had
> to traverse the shoulder in order to reach Mr. Kirby's vehicle.  Almost
> immediately, Mr. Kirby suddenly reversed his vehicle towards Sgt.
> Buckley.  Specifically, Mr. Kirby backed up when Sgt. Buckley arrived at
> the passenger side portion of the Ranger's rear bumper.  Per Sgt.
> Buckley, "Before I could get to the side of the vehicle, the vehicle began
> backing up towards me."  He also heard the Ranger's engine revving and
> observed the Ranger's reverse lights at the time.  Sgt. Buckley estimated
> less than two (2) feet separated him from the Ranger when Mr. Kirby
> drove towards him . . . at approximately seven (7) to eight (8) miles per
> hour.  In response, Sgt. Buckley feverishly attempted to move away from
> the vehicle, which began angling more and more towards him.  Sgt.
> Buckley not only struggled to avoid Mr. Kirby's oncoming vehicle, but the
> large ditch adjacent to the shoulder.  In particular, the sergeant
> unsuccessfully attempted to push off the Ranger's tailgate with his left
> hand in order to avoid the rapidly approaching vehicle and nearby ditch.

---

[4]Mr. Moore, the layperson witness, testified that the distance between all three
cars was less than that, estimating that three to six feet separated the Ranger from the
patrol car and four to six feet separated the Ranger from the unmarked vehicle.  (*See*
Defs.' Ex. 15(A).)

> Unfortunately, the Ranger continued towards the deputy, pushing him into the ditch.  In fear of his life, Sgt. Buckley fired a volley of shots at Mr. Kirby.

(Defs.' Br. at 5-6 (internal citations and alterations omitted).)

Defendants contend that "[i]t is undisputed that Deputies Carrier and Duva also fired their weapons at Mr. Kirby."  (Defs.' Br. at 6.)  Indeed, Defendants have produced evidence which supports their position that both Defendants Carrier and Duva fired their weapons because they believed that Defendant Buckley was going to be run over.  Specifically, Defendant Carrier testified that he "heard a couple of shots ring out and . . . that drew [his] attention to [Defendant Buckley], and the truck was still moving backwards and [he] saw Buckley kind of slip down."  (Carrier Dep. I at 110-111, Defs.' Ex. 8.)  It looked to Defendant Carrier that Sgt. Buckley was getting run over.  (Carrier Dep. II at 47, Defs.' Ex. 8(A).)   Similarly, Defendant Duva testified that he fired because he "looked back, [his] sergeant had his hand on the tailgate and was slipping, and the vehicle was still in reverse, you could hear the motor revving, at that point in fear for [his] sergeant's life [he] shot two rounds at the driver."  (Duva Dep. I at 66, Defs.' Ex. 9.)  Duva also stated that the vehicle at that point switched directions and moved forward towards Duva, and he began firing shots as he was in concern for his own safety.  (*See* Defs.' Ex. 12(c) at 14.)  According to Defendants,

> Mr. Kirby briefly stopped the Ranger following the initial shots.  However, he continued his defiant behavior by revving his engine and immediately proceeding forward towards Deputy Duva.  Now in fear of Deputy Duva's life, Sgt. Buckley fired another volley of shots at Mr. Kirby.  Deputy Carrier responded in a similar manner.  The deputy also feared for his own safety as Mr. Kirby's aggressive conduct forced him farther onto Lapeer towards oncoming traffic.

(Defs. Br. at 7 (internal citations omitted).)  Defendants estimate that the entire shooting lasted only seconds.  (*Id.*)  Medical officials pronounced Mr. Kirby dead on the scene at 3:31 p.m.  (Defs.' Ex. 16 at 16.)  It is undisputed that no weapons were found in Mr. Kirby's vehicle.

Defendants also rely on the testimony of Rose Kornieck, who witnessed the scene from behind Paul Moore's full-sized van.  From her vehicle, she could only see Defendant Buckley and the Ranger.  She testified that she could see Defendant Buckley hanging on to the passenger side of the Ranger, near the wheel well, as the truck was moving.  (Kornieck Dep. at 39, Defs.' Ex. 13.)  She stated that she thought Defendant Buckley was going to be killed, and that he was losing his footing and slipping into the ditch.  (*Id.*)

### C.  Plaintiffs' Version of the Traffic Stop

Plaintiff relies primarily on the testimony of Paul Moore, who witnessed the scene from his van, which was parked behind the deputies at the time of the shooting.  Mr. Moore gave a statement the day of the shooting, which Defendants contend establishes that, at least on the day he gave the interview, Mr. Moore believed that the deputies were justified in shooting Mr. Kirby.  (Police Report, Defs.' Ex. 15(d) at 16-17.) Specifically, the investigation report indicates that Mr. Moore stated that "if the officer had not jumped out of the way, he would have been struck by [Mr. Kirby's] truck."  (*Id.* at 16)  The report also states that Mr. Moore advised the "undersigned Detective that he felt that the incident was a 'justified shooting.'  At this point, undersigned Detective asked Mr. Moore why he felt it was a justified shooting.  Mr. Moore advised undersigned

7

Detective that he could not see what was in the Driver's hand, when the officer shot."

(*Id.* at 17.)

In an oral interview conducted by Plaintiffs' attorneys on January 13, 2004, Mr. Moore further elaborated on his version of the events.[5] He stated that after Mr. Kirby's vehicle was pulled over, the officer sitting in the passenger side of the patrol car exited his vehicle and began approaching the Ford Ranger pickup, Mr. Kirby's vehicle.  (Moore Inter. at 14-15, Defs.' Ex. 15(c).)  Mr. Moore then answered the following questions:

Q    Okay.  So he started walking in the west direction, towards the green Ford Ranger pickup.  And what did you observe after that?

A    At that time I seen [sic] he was moving towards the back of the pickup.  The pickup started to move backwards and on an angle, and at that time the officer kind of went towards the corner of the pickup and then jumped to the side, into a ditch area.  And the pickup started to move forward a little bit, and then it stopped at the same time the man that came out of the passenger's side of the cruiser came up the side of the ditch, to where he was about to where the rear wheel well of the pickup was, with his gun drawn.

Q    Okay.  Let's break that down a little bit.  He starts walking towards the truck, and the green Ford pickup was backing up?

A    Started to back up; yes.

Q    How fast was it moving when it was backing up?

A    Not very fast.  He was just -- he didn't have that much room to really get anywhere.

Q    Could you gauge how far away the police cruiser was from the truck when they were stopped?

A    Well, it didn't look like he had much more than a few feet to me -- left.  And from my angle it looked like if he would have backed up

---

[5]While Defendants characterize this interview as a "sworn statement," (Defs.' Mot. Br. at 15), Plaintiffs counsel indicated at the June 14, 2006 hearing that Mr. Moore was not under oath when this interview was taken.

8

> any further, he would have hit the corner of the cruiser, the front passenger corner.

Q      Okay. All right. So you say this gentleman then hopped away from the truck and went down in the ditch?

A      Slightly; he didn't go all the way into the ditch. He just -- there's the embankment; he just went down on the embankment.

Q      Okay. Did he lose his footing and fall down or --

A      He never fell down. He never actually come off his feet. When he was trying to come back up the embankment, he was slipping in the mud.

(*Id.* at 15-16.) During this interview, Mr. Moore stated that as the car was reversing, "it wasn't fast; it wasn't a crawl. It was, you know, a normal speed for someone who is trying to back up and go around something. He was not accelerating excessively. He was not -- you know , he was not gunning it. There was no revving of the engine." (*Id.* at 71.) Mr. Moore first stated that the officer began shooting after the vehicle had stopped, (*id.* at 18),[6] but later stated that it was "all almost instantaneous. As he was scurrying up the hill he raised his revolver to shoulder level. And within seconds he started firing," (*id.* at 22). When later asked again, he stated that "[i]t appeared to be stationary to me when the shots were fired," and that "[t]o me it looked like for sure that the truck was stopped. I mean, it wasn't going anywhere." (*Id.* at 76.) He stated it had

---

[6]Specifically, Mr. Moore testified as follows:

Q.      And so when the vehicle stopped, you said the male raised his firearm?
A.      Yes.
Q.      Okay. And what happened after that?
A.      At that point he started firing rapidly through the – on an angle through the middle windows of the pickup . . .

(Moore Inter. at 18, Defs.' Ex. 15(c).)

been stationary for a few seconds.  (*Id.*)  Mr. Moore also stated that it did not appear

that the vehicle would strike the officer at the time the shooting began.  (*Id.* at 26, 43-

44.)

During the interview, Mr. Moore also indicated that the Defendant deputies

"wouldn't allow the EMT to bother to work on [Mr. Kirby], so I figured at that point they

considered him dead and even if he was wasn't [sic], that he was going to be."  (*Id.* at

48.)  When asked about the police report, Mr. Moore stated that the officer who took his

statement never went over the whole statement.  (*Id.* at 50.)  Regarding the police

report, he further explained:

> Q.    Okay.  Did the question ever come up as to whether the individual
> in the green pickup had a gun or not -- with either one of the
> detectives that talked to you?
>
> A.    When I was talking to the detective at the house, it came up that --
> because he wanted to know if I seen anything.  I told him, you
> know, I seen the officer shoot when he was standing on the side of
> the truck, but I could not see, you know, why he shot.
>
> Basically they wanted to know if I knew why he shot the guy.  And I
> said, you know, I don't know.  I mean, if it was because he was
> afraid of the pickup -- I told him it couldn't have been that, because
> he was standing on the side of it when he fired.  So he was in no
> danger of the pickup; I let the detective know that.
>
> But I told him at that point that I could not see what the driver of the
> pickup had in his hands, if anything.  So I had no idea what was
> going on in the cab of the pickup.
>
> Q     Did you comment to that detective about anything, about if there
> was an absence of a gun by the driver of the green pickup?
>
> A     Not particularly in that manner.  Like I told him, why the officer fired,
> I didn't know.  He was in no danger at the time that I could see.
>
> Q     Okay.

A       There was no danger of the truck itself.  And like I said, I had no
        idea what --

Q       Is that when the detective said uh-oh?

A       When I told him that yes, he was definitely standing off to the side
        of the truck and wasn't in danger of being hit by the truck when he
        fired, that's when he made the uh-oh comment.

(*Id.* at 86-87.)

        Mr. Moore also testified at a deposition, which was conducted on March 11,

2006.  Contrary to Defendants' assertions, Mr. Moore testified in a manner substantially

similar to that in which he testified during the January 13, 2004 interview.

        Specifically, he testified that on November 4, 2003, he was at a stop sign, waiting

to turn onto Lapeer Road, when he witnessed Mr. Kirby's Ford Ranger drive by, at

approximately 60 or 65 miles per hour.  (Moore Dep. at 39, Defs.' Ex. 30.)  Although the

posted speed limit is 55 miles per hour on Lapeer Road, Mr. Moore testified that Mr.

Kirby was traveling at the speed most people travel on that road.  (*Id.*)  Mr. Moore then

saw a patrol car following behind Mr. Moore, at a higher rate of speed, as though it were

trying to catch up with him.  (*Id.*)  Mr. Moore turned onto Lapeer Road in the direction

the Ford Ranger and the patrol car had gone.  (*Id.* at 40.)  The patrol car's lights were

on, but Mr. Moore did not hear a siren.  (*Id.* at 41.)  Mr. Moore noticed brake lights on

both the Ranger and the police car, and both cars eventually stopped.  (*Id.* at 43.)  Mr.

Moore stopped about six to ten feet behind the police car.  (*Id.* at 44.)  Mr. Moore

explained the events that transpired next:

        The officer in the passenger side [Defendant Buckley] had gotten out and
        started moving towards the green Ranger at the same time as when the
        black pickup [Defendant Duva's unmarked police car] had pulled in front of
        the green Ranger.

11

As he was walking towards the front of the cruiser, the green Ranger attempted to back up on a bit of an angle in this direction as if he was trying to pull out of a parallel parking spot to get around the black van.  He moved back just a few feet.  It looked like if he would have moved back any farther, he would have hit the front of the cruiser.  He tried to pull forward and couldn't turn to get around the black pickup and stopped.

At the time that he started to back up, the officer was not quite to the front of the cruiser yet.  He had come down this way into the embankment of the ditch; and as he tried to pull forward, he came around, kind of scurried up the side of the ditch here; and then, as he stopped, the one officer would have been right at the [rear] wheel well of the black Ranger or the green Ranger.

(*Id.* at 52-53.)  When asked what Defendant Buckley did when he got out of the vehicle,

Mr. Moore reiterated:

A       He had gotten out and just started moving towards the Ranger; and, like I said, at that time, as the Ranger started moving, he just went down, kind of hopped down onto the embankment,[7] off to the gravel onto the embankment of the ditch, and then walked up that way, and then kind of scurried back up the side of the embankment, slipping a little bit, because everything was wet.

Q       Now the Ranger was moving in reverse?

A       Moved a little bit in reverse and then moved a little bit forward and then stopped.

Q       But it moved towards the officer as he was walking towards it?

A       It moved towards the cruiser, not the officer.  He could have never come in contact with the officer.

(*Id.* at 54.)   Mr. Moore was again asked where Defendant Buckley walked after he left

his vehicle:

---

[7]Further, he testified that when Defendant Buckley "hopped" into the ditch, the Ford Ranger was moving in the direction of the patrol car.  (*Id.* at 89.)

12

> A He started walking in this direction as the green Ranger tried to back up in this direction. He just went down here into the ditch, the embankment.
>
> Q As the pickup moved backwards or in reverse, he went into the ditch?
>
> A Yes. He slipped down onto the embankment of the ditch. He wasn't all the way into the bottom of the ditch. He just went on the embankment.
>
> Q The pickup was moving in reverse while the officer was walking towards Mr. Kirby's vehicle?
>
> A Yes. He was walking towards the front of his cruiser and the back of the vehicle.

(*Id.* at 55.) Mr. Moore agreed with Defendants that at some point Defendant Buckley grabbed hold of the Ford Ranger, but according to Mr. Moore, it was because Defendant Buckley slipped in the mud and used the truck to regain his balance. (*Id.* at 69.)

Contrary to Defendants' testimony, Mr. Moore testified that Mr. Kirby never drove his vehicle toward Defendant Duva, but rather drove it forward toward Defendant Duva's automobile. (*Id.* at 70.)

Regarding the police report, Mr. Moore testified that he had never seen a copy of the report which Detective Manns, who took Mr. Moore's statement, had prepared. (*Id.* at 30, 83, 101.) He also testified that Detective Manns never read some of the statements back to Mr. Moore. (*Id.* at 101.) Moreover, he stated that he did not say some of the things that are found in the report. (*Id.* at 84-85.) Specifically, Mr. Moore explained that he never said that Mr. Kirby's vehicle was backing up toward Defendant Buckley, but that instead he had said it was backing up toward the police car. (*Id.* at 85, 99, 102.) He also testified that he never told Detective Manns that he thought it was a

13

justified shooting, stating that he did not know how Defendant Buckley "felt," but that he also did not know "why he would think he was in danger" and that he did not see "where he was in danger." (*Id.* at 86-89.) Indeed, Mr. Moore testified that when the deputies started shooting, Mr. Kirby was "already stopped as far as [Mr. Moore] was concerned. He couldn't get out between the patrol car and the black truck. He wasn't going anywhere. So, I see no reason to shoot him at all at that point; but, then, again, I could not see into his truck. I don't know if he had a weapon or not." (*Id.* at 93.) He reiterated, "[i]f they were worried about him getting away, he couldn't. He wasn't going anywhere." (*Id.*) Rather, according to Mr. Moore, Mr. Kirby's brake lights were on "and he was at a full stop when Officer Buckley started shooting." (*Id.* at 106-107.)

Finally, Mr. Moore could not tell whether Defendant Carrier had fired any shots at all. (*Id.* at 107.) He testified that Defendant Buckley shot first – into the cab of the truck – and Defendant Duva shot next, "but he was shooting into the truck not into the cab of the truck." (*Id.* at 107.)

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

14

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"). A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486,492 (6th Cir. 2004) ("[W]e must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'") (citation omitted). The court does not weigh the evidence to determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

15

### III.  DISCUSSION[8]

### A.  Defendant Muxlow

As an initial matter, the court notes there is no evidence that Defendant

Lieutenant Muxlow violated any constitutional right or, further, any state tort at issue in

this lawsuit.  The court therefore inquired at the hearing as to whether  Defendant

Muxlow is a proper party to this lawsuit, and Plaintiffs conceded that he was not.

Defendants' motion will therefore be granted as to Defendant Muxlow.

### B.  Count I: 42 U.S.C. § 1983, Excessive Force

To prevail on a claim brought under 42 U.S.C. § 1983, Plaintiffs must prove that

Defendants acted "under color of law" and that their conduct deprived Plaintiffs of a

right, privilege, or immunity secured by the Constitution or the laws of the United States.

 42 U.S.C. § 1983; *Markva v. Haveman*, 317 F.3d 547, 552 (6th Cir. 2003); *Ahlers v.

Schebil,* 188 F.3d 365, 370 (6th Cir. 1999).  The parties do not dispute that Defendants

were acting under color of law and the court must focus on whether Plaintiffs can

establish a violation of Mr. Kirby's clearly established constitutional rights.

The sole constitutional standard for evaluating claims of excessive force during

the course of an arrest is the reasonableness criterion of the Fourth Amendment.

*Graham v. Connor*, 490 U.S. 386, 395 (1989); *Gaddis v. Redford Twp.*, 364 F.3d 763,

772 (6th Cir. 2004).  Determining whether the force used to make a particular seizure is

reasonable under the Fourth Amendment "requires a careful balancing of the nature

---

[8]The court notes that the parties' briefing did not address every count in Plaintiffs'
complaint, nor every defendant.  In an effort to provide some organization to this matter,
and to streamline this case for trial, the court will first address Defendant Muxlow (who
was not explicitly addressed in the briefing), and then proceed to discuss the claims
asserted in the "First Amended Complaint," count by count.

and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests." *Graham*, 490 U.S. at 396.  "Courts must apply an objective standard, looking to 'the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or attempting to evade arrest by flight.'" *Gaddis*, 364 F.3d at 772 (quoting *Graham*, 490 U.S. at 396).

Courts assess the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, not *ex post* with the benefit of 20/20 hindsight. *Graham*, 490 U.S. at 396.  The court's reasonableness calculus allows "for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.  Totally gratuitous uses of force, however, may be excessive. *Gaddis,* 364 F.3d at 772 (citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)).  In addition, the subjective intentions of the officers involved are not relevant to whether the force used was reasonable. *Graham*, 490 U.S. at 397.

Defendants argue that they are entitled to qualified immunity and summary judgment on Plaintiffs' excessive force claim because their actions did not violate a constitutional right and, even if they did, their actions were not unreasonable in light of the state of the law in 2004.

Government officials, such as Defendants, "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts in the Sixth Circuit evaluate qualified immunity claims using a three-part inquiry. *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). First, the court must determine whether the plaintiff has alleged facts, which taken in a light most favorable to him, show that the defendant-official's conduct violated a constitutionally protected right. *Toms*, 338 F.3d at 524. Second, if the first inquiry is answered in the affirmative, the court determines whether the right that was violated was clearly established such that a reasonable official, at the time the act was committed, would have understood that his conduct violated that right. *Id.; Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). Finally, the court determines whether the plaintiff has alleged sufficient facts and supported his allegations with sufficient evidence to indicate that what the official did was unreasonable in light of the clearly established constitutional right. *Toms*, 338 F.3d at 524.[9] The court must ask whether "any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir. 1987).

Examining all three steps in the light of known facts shows that the individual deputies who were at the scene and fired at Mr. Kirby are not entitled to summary judgment or to qualified immunity. First, viewing the facts in a light most favorable to

---

[9] The United States Supreme Court, and some panel decisions of the Sixth Circuit, describe the qualified immunity inquiry in two steps, folding the third step described into the first two. *See Saucier*, 533 U.S. at 194; *Comstock*, 273 F.3d at 702.

Plaintiffs, as the court must, a reasonable jury could find that Defendants used excessive force when they shot and killed Mr. Kirby.  Defendants base their justification for use of deadly force on Mr. Kirby's perceived attempt to run the deputies down and flee the scene.[10]  Mr. Moore, however, testified that Mr. Kirby's vehicle did not "charge" any of the Defendants, nor accelerated in any threatening manner, but rather was trying to move around the police vehicles as if the driver were trying to leave a parallel parking space.  Mr. Moore testified that at the time the first shots were fired, Mr. Kirby's car had already stopped moving and the brake lights were on.  If a jury were to credit such testimony, as they are entitled to do, and correspondingly discount testimony that Kirby was attempting to run down one or more deputies, that jury could find that Defendants' use of deadly force was excessive.

Second, the right to be free from such excessive force is clearly established in the case law and a reasonable officer would know that such conduct constitutes excessive force in violation of the Fourth Amendment.  *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004).  As the Sixth Circuit noted in *Champion*,

> We have repeatedly stated that "the right to be free from excessive force is a clearly established Fourth Amendment right."  *Neague v. Cynkar,* 258 F.3d 504, 507 (6th Cir. 2001) (decided after *Saucier*).  For example, we have articulated a clearly established right to be free from specific types of non-deadly excessive force, such as handcuffing an individual too tightly. *See Walton v. City of Southfield,* 995 F.2d 1331, 1342 (6th Cir. 1993).  We have also consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly

---

[10]Importantly, there is no allegation that Defendants used deadly force because they believed Mr. Kirby possessed a firearm he was attempting to use against them. The asserted justification relies exclusively on Mr. Kirby's alleged use of an automobile as a deadly weapon.

established right.  *See, e.g., Phelps v. Coy,* 286 F.3d 295, 301 (6th Cir.
2002) ("[T]here was simply no governmental interest in continuing to beat
Phelps after he had been neutralized, nor could a reasonable officer have
thought there was."); *McDowell v. Rogers,* 863 F.2d 1302, 1307 (6th Cir.
1988) ("[A] totally gratuitous blow with a policeman's nightstick may cross
the constitutional line."); *Lewis v. Downs,* 774 F.2d 711, 715 (6th Cir.
1985) ("The unprovoked and unnecessary striking of a handcuffed citizen
in the mouth with a nightstick is clearly excessive.").

*Champion*, 380 F.3d at 902.

Third, and finally, when taking the evidence presented in a light most favorable to

Plaintiffs as required under Rule 56, the court finds that a reasonable jury could

conclude that Defendants' conduct during the traffic stop was unreasonable under

Fourth Amendment standards.  Defendants' unavailing argument relies on the *deputies'*

version of the facts and minimizes the sworn testimony of Mr. Moore.  When taking all

evidence presented in a light most favorable to Plaintiffs, the claim of excessive force

survives the individual officer Defendants' motion for summary judgment.

Defendants rely heavily on three cases for the proposition that they did not use

excessive force in shooting Mr. Kirby and that, even if they did, their actions were not

unreasonable under Fourth Amendment precedent.  *See Smith v. Freland,* 954 F.2d

343 (6th Cir. 1992); *Dudley v. Eden,* 260 F.3d 722 (6th Cir. 2001); *Williams v. City of*

*Grosse Pointe Park*, No. 03-73596, 2005 WL 2173686, at *5 (E.D. Mich. Sep. 6, 2005).

First, Defendants cite *Freland,* 954 F.2d at 344, in which the Sixth Circuit found

summary judgment proper in a case involving facts similar, but not identical, to those

before the court.  In *Freland*, after a high speed car chase lasting 2.6 miles, the

decedent turned his car into a residential neighborhood and onto a lawn.  The officer

stopped his car, thinking he had boxed in the decedent, and proceeded to exit his

vehicle.  The decedent suddenly

> backed up his car, then sped forward and crashed into Officer Schulcz's
> car. He backed up again and zoomed around the police car, smashing into
> the fence and gate as he did so. As [the decedent's] car drove past,
> Officer Schulcz pulled his gun and fired one shot at it. The bullet entered
> the passenger side of the car, pierced the passenger seat, then struck [the
> decedent] in his right side, killing him.

*Id.* at 344. Citing *Graham*'s prohibition on substituting the court's 20/20 vision of

hindsight for the reasonable officer's on-the-scene judgment, the Sixth Circuit noted:

> [W]e must avoid substituting our personal notions of proper police
> procedure for the instantaneous decision of the officer at the scene. We
> must never allow the theoretical, sanitized world of our imagination to
> replace the dangerous and complex world that policemen face every day.
> What constitutes "reasonable" action may seem quite different to someone
> facing a possible assailant than to someone analyzing the question at leisure.

*Freland,* 954 F.2d at 346-347 (citing *Graham,* 490 U.S. at 396-97). The *Freland*

court found that the facts of that case justified the grant of summary judgment:

> After a dramatic chase, Officer Schulcz appeared to have trapped his man
> at the end of a dark street. Suddenly Mr. Smith freed his car and began
> speeding down the street. In an instant Officer Schulcz had to decide
> whether to allow his suspect to escape. He decided to stop him, and no
> rational jury could say he acted unreasonably. Even if there were a
> roadblock at the end of Woodbine Avenue, Officer Schulcz could
> reasonably believe that Mr. Smith could escape the roadblock, as he had
> escaped several times previously. In any event, Mr. Smith had freed his
> car from Officer Schulcz's attempted blockade, and was undoubtedly
> going to escape from Officer Schulcz, if not the entire police force. Had he
> proceeded unmolested down Woodbine Avenue, he posed a major threat
> to the officers manning the roadblock. Even unarmed, he was not
> harmless; a car can be a deadly weapon. *See, e.g., United States v.
> Sanchez,* 914 F.2d 1355 (9th Cir. 1990), *cert. denied,* 499 U.S. 978, 111
> S.Ct. 1626, 113 L.Ed.2d 723 (1991). Finally, rather than confronting the
> roadblock, he could have stopped his car and entered one of the
> neighboring houses, hoping to take hostages. Mr. Smith had proven he
> would do almost anything to avoid capture; Officer Schulcz could certainly
> assume he would not stop at threatening others.

*Freland,* 954 F.2d at 347. Despite Defendants' attempts to draw parallels to this case,

however, the facts presented in *Freland* are considerably more aggravated than, and

accordingly distinguishable from those which a reasonable jury could find are present in

this case.  Viewing the facts in a light most favorable to Plaintiffs, a rational jury could

find in this case that, although the circumstances were tense and that the events

occurred rapidly, there had been no high-speed car chase, no dramatic attempt to flee,

no significant danger to innocent motorists, indeed, no substantial danger even to

Defendant Buckley as he climbed up the embankment.  Mr. Moore testified that Mr.

Kirby's car had completely stopped moving by the time Defendant Buckley started

shooting and that there was "no way" that Mr. Kirby could have fled the scene.

For this reason, this case is also distinguishable from *Dudley,* 260 F.3d at 727, in

which the Sixth Circuit upheld summary judgment of an excessive force claim involving

a high speed car chase following a bank robbery.  The court stated the facts of that

case as follows:

> In this case, there is no doubt that the events that Officer Eden faced
> unfolded very quickly. When Officer Eden received a call from the police
> dispatcher he was told Dudley had just committed a bank robbery.
> Although the dispatcher reported that Dudley had not displayed any
> weapons while robbing the bank, Eden reasonably perceived a real
> possibility that, like many bank robbers, Dudley was armed. Officer Eden
> arrived at the scene and saw Officer Lewis standing by Dudley's vehicle in
> a parking lot.  Moments later, Dudley accelerated out of the parking lot
> and shots were fired.  Dudley swerved recklessly into oncoming rush hour
> traffic before returning to the correct side of the street and heading west
> towards Route 91.  Given Dudley's bank robbery, his refusal to comply
> with the commands of armed policemen, his attempt to evade arrest, and
> his reckless driving, it was reasonable for Officer Eden to conclude that
> Dudley posed a serious threat to himself and others.

*Id.* at 727.  Defendants argue that *Dudley* mandates summary judgment in this

case because the *Dudley* court upheld summary judgment even though, as in

this case, a factual dispute existed regarding whether the decedent's car had

stopped when the police officer shot him.  (Defs.' Br. at 12 (citing *Dudley*, 260

22

F.3d at 724).)  Nonetheless, unlike in this case it was undisputed in *Dudley* that the decedent had collided with the police cruiser.  *Id.* at 727.  More importantly, there was no evidence in *Dudley* that the officers had the decedent under control.  *Id.* ("Although the cars slowed to a halt, there is no evidence that Officer Eden had Dudley under control.  If Dudley had put his car into reverse, he could have continued his escape and Eden would have been powerless to stop him.").  Indeed, the *Dudley* court noted that "[i]t would have only taken a few seconds for Dudley to swerve back into oncoming traffic and hit an innocent motorist as he had almost done minutes before."  *Id.*  Here, according to Mr. Moore's testimony, when the deputies started shooting, Mr. Kirby was "already stopped as far as [Mr. Moore] was concerned.  He couldn't get out between the patrol car and the black truck.  He wasn't going anywhere."  (Moore Dep. at 93, Defs.' Ex. 30.)  Moreover, the *Dudley* court also relied upon the defendant officer's reasonable fear that the decedent presented a danger because he may have been armed.  *Dudley*, 260 F.3d at 727.  Here, while Mr. Moore noted that he could not tell if Mr. Kirby was armed and therefore dangerous, (Moore Dep. at 93, Defs.' Ex. 30), Defendants do not claim they shot Mr. Kirby under the belief he was armed.  This case is therefore neither guided nor governed by *Dudley.*

The court also rejects Defendants contention that this case is "almost identical" to one in which another judge of this district court recently dismissed an excessive force claim.  (Defs.' Mot. Br. at 13 (citing *Williams*, 2005 WL 2173686, at *5).  In that case, unlike in this case, the undisputed facts revealed that "[v]iewed objectively, Williams' conduct showed that he was not intimidated by

23

the police presence, would not hesitate to deliberately use the vehicle as a weapon, and was intent on fleeing from the police, which in turn posed a threat to the public traveling on a major Detroit thoroughfare." *Id.*  As discussed above, Mr. Kirby's behavior at the time of the shooting, and in the moments leading up to the shooting, is sharply disputed.  Moreover, as with *Dudley*, the *Williams* court based its decision partly on the fact that the officer believed the plaintiff to be armed.  *Id.* ("Officer Miller did not know that Williams or his passengers were unarmed.").  Under the facts of *Williams*, the officer had "probable cause to believe that Williams posed a threat of serious physical harm to Sgt. Hoshaw, himself, and to other citizens . . . [B]ased on Williams' conduct, it was uncertain if he would once again back up the vehicle towards Sgt. Hoshaw or would speed off into traffic, jeopardizing other motorists and citizens in the area." *Id.*  Although it is true in this case that Mr. Kirby's acts, especially seen from Defendants' viewpoint, could be characterized as those of a person "[un]intimidated by the police presence," "not hesit[ant] to deliberately use the vehicle as a weapon, and [ ] intent on fleeing from the police, which in turn posed a threat to the public traveling on a major [ ] thoroughfare," *id.,* Mr. Moore's testimony could be viewed by a reasonable jury as diluting in major part these proffered conclusions.

Finally, the court finds that, contrary to Defendants' argument, this motion is substantially controlled by the holding in *Sigley v. City of Parma Heights,* 437 F.3d 527 (6th Cir. 2006), in which the Sixth Circuit found that summary judgment was improper where there were disputed factual issues surrounding the use of deadly force.  The court held:

24

> The conflicting views of the facts demonstrate that there are unresolved
> factual issues regarding whether Mockler was chasing after Davis' car or
> the car was turning into him when he fired.  Additionally, it is not clear
> whether Mockler had probable cause to believe that Davis posed a
> significant threat of death or serious physical injury to others.  Viewing the
> evidence in a light most favorable to the Plaintiff, these are disputed
> factual issues that preclude the granting of summary judgment.

*Id.* at 536.  As in *Sigley*, there are genuine issues of fact, most importantly whether Mr.

Kirby posed an imminent threat of serious physical injury so as to justify the use of

deadly force in this case.  Summary judgment and qualified immunity are therefore

precluded.

The court is not persuaded by Defendants' argument that, despite *Sigley*, they

are entitled to summary judgment because the *Sigley* opinion was issued after the facts

which gave rise to this lawsuit occurred and therefore was not "clearly established" law

for purposes of qualified immunity.  First, *Sigley* did not announce any new rule of law,

but rather applied clearly established precedent to the particular facts of that case.

Moreover, as Plaintiffs point out, even the *Sigley* court, after holding that the defendant

was not entitled to summary judgment on the excessive force claim, also held he was

not entitled to qualified immunity. *Id.* at 536-537.  If *Sigley* had, as Defendants suggest,

introduced a new rule of law, then the defendant would have been entitled to qualified

immunity.  The Sixth Circuit held, however, that he was not, and this court similarly finds

that Defendants in this case are not entitled to neither summary judgment nor qualified

immunity in light of the significant factual disputes surrounding Mr. Kirby's shooting.

### C.  Count II: "Violation of Ministerial Duties"

In Count II of their "First Amended Complaint," Plaintiffs assert a cause of action

for "Violation of Ministerial Duties."  This court was unaware of any such tort under

25

Michigan law, and at the hearing, Plaintiffs conceded that this is not a separate cause of action. Accordingly, in light of Plaintiffs' concession, and because there is no tort of "violation of ministerial duties," the court will grant summary judgment on this count of Plaintiffs' complaint. *See Johnson ex rel. Smith v. City of Lincoln Park,* --- F. Supp. 2d ---, 2006 WL 1554638, at *14 (E.D.Mich. Jun. 8, 2006) (Rosen, J.) ("Finally, with regard to Plaintiff's claim in Count II denominated as 'violation of ministerial duties,' there is no such cause of action in Michigan.").

### D.   Count III: "Intentional Infliction of Emotional Distress"

Although the Michigan Supreme Court has not officially recognized the tort of intentional infliction of emotional distress, *see Smith v. Calvary Christian Church*, 614 N.W.2d 590 (Mich. 2000); *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905 (Mich. 1985), the Michigan Court of Appeals has repeatedly recognized a cause of action based on intentional infliction of emotional distress and the Sixth Circuit has "assumed that the Michigan Supreme Court would do so too under appropriate circumstances." *Andrews v. Prudential Sec., Inc.*, 160 F.3d 304, 309 (6th Cir. 1998). Recovery requires a plaintiff to prove "(1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Moore v. City of Detroit*, 652 N.W.2d 688, 691 (Mich. Ct. App. 2002).

At the June 14, 2006 hearing, Plaintiffs withdrew their arguments under this count, and the court will therefore grant summary judgment to Defendants on this claim.[11]

---

[11]The court notes that, even if Plaintiffs had not withdrawn their argument, the court would be inclined to grant summary judgment to Defendants on this claim. As Defendants argue, this case appears to be controlled by *Tope v. Howe*, 445 N.W.2d

### E.  Count IV: 42 U.S.C. § 1983, Municipal Liability

Plaintiffs cannot rely on *respondeat superior* to hold the County of St. Clair liable

under § 1983.  *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Instead, Plaintiffs must establish that the city's official policies or customs (or lack

thereof) were a "moving force" behind the deprivation of Plaintiffs' rights and arose as a

result of "deliberate indifference" to his rights.  *See Doe v. Claibome County*, 103 F.3d

495, 508 (6th Cir. 1996).

> In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court held that
>
> the inadequacy of police training may serve as the basis for § 1983 liability
> *only where the failure to train amounts to deliberate indifference* to
> the rights of persons with whom the police come into contact . . . . Only
> where a failure to train reflects a *'deliberate' or 'conscious' choice by a
> municipality*--a 'policy' as defined by our prior cases--can a city be liable
> for such a failure under § 1983.

*Id.* at 388-89 (emphasis added).  The *City of Canton* Court further explained its

conception of "deliberate indifference" in the context of municipal liability by adding,

> The issue in a case like this one . . . is whether [the] training program is
> adequate; and if it is not, the question becomes whether such inadequate
> training can justifiably be said to represent city policy.  It may seem
> contrary to common sense to assert that a municipality will actually have a
> policy of not taking reasonable steps to train its employees.  But it may
> happen that in light of the duties assigned to specific officers or employees
> the need for more or different training *is so obvious, and the inadequacy
> so likely to result in the violation of constitutional rights*, that the
> policymakers of the city can reasonably be said to have been deliberately
> indifferent to the need.

---

452, 460 (Mich. Ct. App. 1989), in which the Michigan Court of Appeals has upheld a
dismissal of a claim for intentional infliction of emotional distress when a plaintiff failed
to provide evidence that officers effecting a legal arrest intended to cause the plaintiffs
distress.

*Id.* at 390. "Deliberate indifference is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." *Bd. of*

*County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 410 (1997).

"To establish liability under *City of Canton,* 'the plaintiff must prove . . . [1] that the

training program at issue is inadequate to the tasks that officers must perform; [2] that

the inadequacy is the result of the city's deliberate indifference; and [3] that the

inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury.'" *Russo v. City*

*of Cincinnati,* 953 F.2d 1036, 1046 (6th Cir. 1992) (quoting *Hill v. McIntyre,* 884 F.2d

271, 275 (6th Cir.1989)).  In addition, the focus of the court's inquiry is on the training

program itself and testimony that shows individual officers did not have specific training,

standing alone, is insufficient to defeat summary judgment.  *City of Canton,* 489 U.S. at

390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to

fasten liability on the city, for the officer's shortcomings may have resulted from factors

other than a faulty training program.").

At the June 14, 2006 hearing, Plaintiffs' counsel stated that after reviewing all of

the relevant evidence in this case, he could no longer in good faith assert a cause of

action against the County of St. Clair, under the present "First Amended Complaint."

The court agrees, and will grant summary judgment to the County of St. Clair.[12]

---

[12]In their motion, Defendants argued that "all of the deputies involved in the
shooting were certified officers with substantial experience in both the department's
DTF and road patrol."  (Defs.' Mot. Br. at 20.)  Defendants also relied on *Berry v. City of
Detroit,* 25 F.3d 1342, 1354 (6th Cir. 1994) to argue that Plaintiffs have failed to make "a
showing of a history of widespread abuse that has been ignored by the" County
sufficient to establish "deliberate indifference."  (Defs.' Mot. Br. at 20.)
   In response, Plaintiffs' brief pointed only to evidence related to the post-incident
investigation, both internally and by an independent agency, the Michigan Sheriff's
Special Investigations Team ("MISSION"), to support an argument that Defendants'

28

There is simply no evidence which rises to the level of attributing to the County of St. Clair deliberate indifference to Mr. Kirby's constitutional rights, and there are insufficient facts to create a triable issue that any deficiencies in the County of St. Clair's training policies or customs led to the use of excessive force against Mr. Kirby. Moreover, it is not enough for a plaintiff "to show that his injury could have been avoided if the officer had had more or better training."  *Mayo v. Macomb County*, 183 F.3d 554, 558 (6th Cir. 1999).  Summary judgment will therefore be granted in favor of Defendant County of St. Clair.

### F.  Count V: Negligent Infliction of Emotional Distress

In Count V of Plaintiffs' "First Amended Complaint," Plaintiffs assert a cause of action for negligent infliction of emotional distress.  As with the count for Intentional Infliction of Emotional Distress, Plaintiffs conceded this claim at the motion hearing. Consequently, the court will grant summary judgment to Defendants on Count V.[13]

### G.  Count VI: Gross Negligence

In Plaintiffs' sixth count, they assert that Defendants breached their duty to "avoid engaging in conduct so reckless as to demonstrate a substantial lack of concern for whether death or injury result therefrom" when they fired shots at Mr. Kirby's upper

---

*post*-incident procedures were defective and tainted.  None of this is relevant, however, to the County of St. Clair's policies, training procedures, or lack thereof, which may have led to Mr. Kirby's death.

[13]Indeed, under Michigan law, the tort of negligent infliction of emotional distress is only available when a plaintiff "witnesses negligent injury to a third party and suffers mental disturbance as a result."  *Teadt v. Lutheran Church Missouri Synod*, 603 N.W.2d 816, 823 n.6 (Mich. Ct. App. 1999); *Duran v. Detroit News, Inc.*, 504 N.W.2d 715, 720 (Mich. Ct. App. 1993).  It is undisputed by the parties that Plaintiff Brenda Kirby was not present at the time Mr. Kirby was shot.  (*See* Pls.' Am. Compl. at ¶ 45).

body, neck and head while he sat unarmed in his vehicle.  (Pls.' Am. Compl. at ¶ 50-51.)
Plaintiffs' claim of gross negligence is therefore fully premised on their claim of
excessive force.  Michigan courts do not allow plaintiffs to maintain negligence claims
for intentional actions, and routinely reject such "attempts to transform claims involving
elements of intentional torts into claims of gross negligence." *VanVorous v. Burmeister,*
687 N.W.2d 132, 143 (Mich. Ct. App. 2004) (citing *Smith v. Stolberg,* 586 N.W.2d 103
(Mich. Ct. App.1998); *Sudul v. Hamtramck,* 562 N.W.2d 478 (Mich. Ct. App.1997).
Defendants admitted at the June 14, 2006 hearing that when the Defendant deputies
fired their weapons at Mr. Kirby's vehicle, they did so intentionally.  Accordingly, there
can be no cause of action for a negligent tort, and Defendants are entitled to summary
judgment on this claim.[14]

## H.  Count VII: Civil Conspiracy

In Count VII of Plaintiffs' "First Amended Complaint," Plaintiffs plead civil
conspiracy to violate Plaintiffs' decedent's civil rights.  Although Plaintiffs do not specify
the exact basis for the claim, the court construes Count VII as a conspiracy claim under
42 U.S.C. § 1983.  The Sixth Circuit has outlined the standard for reviewing a § 1983
conspiracy claim:

> A civil conspiracy is an agreement between two or more persons to injure
> another by unlawful action.  Express agreement among all the conspirators
> is not necessary to find the existence of a civil conspiracy.  Each conspirator
> need not have known all of the details of the illegal plan or all of the
> participants involved.  All that must be shown is that there was a single plan,
> that the alleged coconspirator shared in the general conspiratorial objective,
> and that an overt act was committed in furtherance of the conspiracy that
> caused injury to the complainant.

---

[14]The court notes that if Defendants attempt to raise a negligence defense at trial,
the court will entertain a motion by Plaintiffs' to revive this claim.

30

*Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (citing *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985) (internal citations omitted)).

The parties seem to have experienced some confusion over the contours of Plaintiffs' "civil conspiracy" claim.  Defendants, for example, catalog their analysis of this claim under their discussion of state law claims, despite the fact that they cite federal case law under 42 U.S.C. § 1983.  (Defs.' Mot. Br. at 23.)  Plaintiffs, on the other hand, do not address this claim at all in their brief.  Indeed, the word "conspiracy" only appears once in their entire 52 page response brief.  On page 42 of their brief, Plaintiffs begin a section entitled "Factual Basis for Defendant's Ratification, Condonation, and Willful Refusal to Investigate i.e. Conspiracy."  (Defs.' Resp. Br. at 42.)  This section, however, does not relate in any way to a supposed conspiracy leading to the death of Mr. Kirby, but only to facts which Plaintiffs contend evince a conspiracy to "cover up" the details of the November 4, 2004 traffic stop.  Indeed, Plaintiffs' "First Amended Complaint" appears to rest on these alleged facts as well.  (*See* Pls.' Am. Compl. at ¶¶ 53-59.)  At the June 14, 2006 hearing, Plaintiffs' counsel further clarified that this cause of action, if it arises at all, arises from Defendants' post-incident actions.

In their briefs, neither party cited any authority for the proposition that a cause of action exists to support a claim under § 1983 for conspiracy to cover up an excessive force incident.  At the June 14, 2006 hearing, Plaintiffs' counsel cited a Seventh Circuit case for the general proposition that a cause of action arose out of post-incident coverups, *see Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir. 1979), *rev'd in part,* 446 U.S. 754 (1980), but counsel did not explain how the law of *Hampton* applied to the facts of this case.  In *Hampton,* the plaintiffs, members of the Black Panther Party

31

("BPP") and the mothers of two deceased BPP members, brought a civil rights action for

monetary damages against federal and state law enforcement officers arising from a

gun battle which occurred during a raid on a BPP apartment.  *Id.*  The plaintiffs alleged

that defendants conspired to violate their constitutional rights, both in the events leading

up to the raid and in the events following the raid, involving the investigation of the raid.

The Seventh Circuit found sufficient evidence to create a jury question as to the

existence of two conspiracies:

> The first conspiracy, as we view the evidence, involves the state and
> federal defendants who participated in the pre-raid preparations and
> planning, and the raid itself. The second conspiracy, involving many of
> these same defendants, was the alleged coverup of evidence regarding
> the instigation, preparation and execution of the raid, and the post-raid
> legal harassment of the plaintiffs. These two conspiracies required entirely
> different kinds of activities, both legal and illegal, to achieve their ends. But
> more importantly, these two conspiracies had distinct objectives. The first
> conspiracy was designed to subvert and eliminate the Black Panther Party
> and its members, thereby suppressing both a potential source of unrest,
> turmoil, and even violence in the black community, and a vital, radical-
> black political organization. The second conspiracy harassed the survivors
> of the raid. Moreover, the post-raid conspiracy was intended to frustrate
> any redress the plaintiffs might seek and, more importantly, to conceal the
> true character of the pre-raid and raid activities of the defendants involved
> in the first conspiracy.

*Id.* at 621-22.  While at first glance *Hampton* might appear to support a cause of action

under the facts of this case, there are important distinctions between the cases.  In

*Hampton*, unlike in this case, the plaintiffs clearly articulated the constitutional right

which the defendants purportedly conspired to violate.  *Id.* at 627 ("On the basis of the

post-trial facts, plaintiffs claim that defendants conspired to cause the false arrest,

imprisonment, and prosecution of the survivors of the raid.")  Here, there are no such

allegations.  Moreover, an additional factor in *Hampton* was that defendants were

alleged to have been conspiring to eradicate the BPP and defendants' actions

32

implicated "a class-based discriminatory animus which is at the heart of section

1985(3)'s prohibitions." *Id.* at 624. In this case there are no allegations of a class-

based discrimination in violation of 42 U.S.C. § 1985(3).

     The court has, however, located a Sixth Circuit case stating that in some

circumstances "a conspiracy to cover up a killing, thereby obstructing legitimate efforts

to vindicate the killing through judicial redress, interferes with the due process right of

access to courts." *Swekel v. City of River Rouge,* 119 F.3d 1259, 1262 (6th Cir. 1997)

(citing *Bell v. City of Milwaukee,* 746 F.2d 1205, 1261 (7th Cir.1984)). The court finds

that if Plaintiffs claims survive summary judgment, the only conceivable theory available

to them must arise from the authority of *Swekel.* In *Swekel,* the court held:

> A court must analyze several factors before deciding whether a person's
> fundamental right of access to the courts has been violated. First, a court
> must ascertain whether the abuse occurred pre- or post-filing. When the
> abuse transpires post-filing, the aggrieved party is already in court and
> that court usually can address the abuse, and thus, an access to courts
> claim typically will not be viable. If the abuse occurs pre-filing, then the
> plaintiff must establish that such abuse denied her "effective" and
> "meaningful" access to the courts. She can do this only by showing that
> the defendants' actions foreclosed her from filing suit in state court or
> rendered ineffective any state court remedy she previously may have had.
> In most instances, state courts can address pre-filing abuses by tolling
> the statute of limitations or allowing for a "spoliation of evidence" lawsuit.

*Id.* at 1263-1264 (internal citations and footnote omitted). The facts in this case,

however, do not sustain a cause of action for a conspiracy to deprive Plaintiffs of their

access to the courts based on a post-incident "cover-up." In order to sustain such a

cause of action, Plaintiffs must establish that Defendants' actions prevented them from

bringing suit in state court. *Id.* at 1264 ("The most compelling evidence would be if

Swekel went to the state courthouse and was physically prevented or mechanically

barred from filing her lawsuit or her suit was dismissed as untimely.") Where, as here,

33

none of the evidence before this court even *suggests* that Plaintiffs attempted to go to the state court in the first instance, summary judgment is mandated. *Id.* ("Before filing an 'access to courts' claim, a plaintiff must make some attempt to gain access to the courts; otherwise, how is this court to assess whether such access was in fact 'effective' and 'meaningful'?").

Moreover, to the extent Plaintiffs have asserted a civil conspiracy to violate Mr. Kirby's right to be free from excessive force, they have failed to produce sufficient facts to establish an agreement or plan to shoot and kill Mr. Kirby.  "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient" to state a conspiracy claim under § 1983.  *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).  The Sixth Circuit has noted that "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . . circumstantial evidence may provide adequate proof of conspiracy."  *Spadafore*, 330 F.3d at 854  (quoting *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)).  In this case, all of Plaintiffs' "conspiracy" allegations related to post-incident events.  There are simply insufficient facts, or even allegations, to withstand a summary judgment motion on this claim.

## IV.  CONCLUSION

IT IS ORDERED that Defendants' April 17, 2006 "Motion for Summary Judgment" [Dkt. # 28] is GRANTED IN PART and DENIED IN PART.  Specifically, it is GRANTED with respect to Defendant Muxlow and the County of St. Clair.  It is also GRANTED with respect to Counts II, III, IV, V, VI and VII of Plaintiffs' "First Amended

34

Complaint." It is DENIED with respect to Count I, asserted only against Defendants

Buckley, Duva and Carrier.

                           S/Robert H. Cleland_____
                           ROBERT H. CLELAND
                           UNITED STATES DISTRICT JUDGE

Dated:  June 20, 2006


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, June 20, 2006, by electronic and/or ordinary mail.

                           S/Lisa Wagner_____
                           Case Manager and Deputy Clerk
                           (313) 234-5522